Aeroflow, Inc. v. Arias, 2011 NCBC 20.

STATE OF NORTH CAROLINA

COUNTY OF BUNCOMBE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
11 CVS 1652

AEROFLOW INC.,                          )
                                        )
              Plaintiff,                )
                                        )
v.                                      )    **ORDER ON PLAINTIFF'S MOTION**
                                        )    **FOR A PRELIMINARY INJUNCTION**
CARLOS E. ARIAS, JR., DR.               )
THOMAS P. STERN, AND ADVANCED           )
RESPIRATORY AND SLEEP                   )
MEDICINE, PLLC,                         )
                                        )
              Defendants.               )

{1} This matter is before the Court on Plaintiff Aeroflow Inc.'s ("Aeroflow") Motion for a Preliminary Injunction ("Motion") against Defendant Carlos E. Arias, Jr. ("Arias") pursuant to Rule 65 of the North Carolina Rules of Civil Procedure. For the reasons stated below, the motion is DENIED. The Temporary Restraining Order has expired and is no longer in effect.

> *McGuire, Wood & Bissette, P.A., by Hayley Roper Wells and Rendi Mann-Stadt, for Plaintiff Aeroflow, Inc.*

> *Parker Poe Adams & Berstein LLP, by John H. Beyer and James C. Lesnett, Jr., for Defendants Carole E. Arias, Jr., Dr. Thomas P. Stern, and Advanced Respiratory and Sleep Medicine, PLLC.*

Gale, Judge.

## I. PROCEDURAL BACKGROUND

{2} Aeroflow filed this action in Buncombe County on March 28, 2011 against Defendants Arias, Dr. Thomas P. Stern ("Dr. Stern"), and Advanced Respiratory and Sleep Medicine, Inc. ("ARSM"). On the same day, Aeroflow filed a Motion for Temporary Restraining Order ("TRO") and a Motion for Preliminary Injunction

against Arias. On March 30, 2011, the presiding Superior Court Judge for Buncombe County granted Aeroflow's Motion for TRO. On April 8, 2011, the parties consented to an extension of the TRO until the hearing on Aeroflow's Motion, scheduled for May 2, 2011, in Buncombe County Superior Court.

{3} On April 27, 2011, Defendants filed the Notice of Designation as a Mandatory Complex Business Matter. On April 28, 2011, the Chief Justice of the Supreme Court of North Carolina designated this matter a mandatory complex business matter, and the matter was assigned to the undersigned. On May 2, 2011, the parties consented to a second extension of the TRO until the hearing on Aeroflow's Motion, scheduled in this Court on June 8, 2011. Plaintiff and Defendants filed memoranda in support of their positions on June 3, 2011.

{4} The Court held a hearing on June 8, 2011, at which it received testimony and heard arguments of counsel. By consent of the parties, the hearing was held in Guilford County. The parties consented to an extension of the TRO until July 1, 2011 to allow the issuance of the Court's ruling on the Motion. By telephone conference on June 30, 2011, the Court advised the parties that it would allow the TRO to expire and that a written opinion would follow. The Court's decision and this Order are based on consideration and review of the pleadings, affidavits, briefs, oral testimony, and arguments of counsel.


## II. FACTUAL BACKGROUND

{5} The Court notes that many facts essential to the Court's determination of the motion are not disputed. There are other disputed facts relevant to Plaintiff's probability of success on the merits and whether it has suffered or may suffer irreparable harm justifying injunctive relief. The Court will note the areas of factual dispute. In several instances, the Court's determination is that provisions of the Carlos Arias Employment Agreement ("Agreement") in question may be valid, but there has been insufficient evidence to date to demonstrate a breach of those provisions or that Aeroflow has suffered or will suffer irreparable harm because of

any such breach.[1]  The Court's findings must be viewed in the context of the present Motion and, to that extent, must be considered preliminary and limited to the requested *pendente lite* relief.

A. <u>The Parties</u>

{6} Plaintiff Aeroflow is a North Carolina corporation with its principal place of business in Asheville, Buncombe County, North Carolina.  (First Am. V. Compl. ¶ 1.)

{7} Defendant Arias is a citizen and resident of North Carolina.  (Aff. Of Carlos E. Arias  ("Arias Aff.") ¶ 1.)

{8} Defendant Dr. Stern is a citizen and resident of Mecklenburg County, North Carolina.  (First Am. V. Compl. ¶ 4.)

{9} Defendant ARSM is a professional limited liability company organized and existing under the laws of North Carolina with its principal place of business in Huntersville, Mecklenburg County, North Carolina.  (Answer ¶ 5.)

B.  <u>The Employment Contract and the Dispute Between the Parties</u>

{10} The facts and claims must be considered in light of both the general business in which Aeroflow and ARSM are engaged and the more narrow contractual definition of the term "Business" in the Agreement in question.  As noted below, the contractual definition narrows the scope of the covenants in the Agreement.  The Court utilizes the capitalized term when referring to the contractual definition and the lower case term when referring to the parties' broader business.

{11} Aeroflow is a medical services company.  (Test. Casey Hite at Hr'g June 8, 2011.)  Aeroflow sells durable home medical equipment, including continuous positive airway pressure ("CPAP") machines and supplies, oxygen supplies, nebulizers, aerosol medications, power wheelchairs, and power scooters.  Aeroflow also provides specialized diagnostic testing, such as diagnostic sleep tests and

---

[1] Mr. Casey Hite testified that the Arias Agreement is an older contract form and that the covenants differ from the employment contracts Aeroflow now uses. Casey Hite, is Aeroflow's Vice President who appeared and presented live testimony at the June 8 hearing.  He is the brother of Don J. Hite, Aeroflow's President who verified the Complaint upon which the TRO was issued.

pulmonary function tests. Aeroflow conducts the majority of its diagnostic testing in physicians' offices and conducts a small minority of testing in patients' homes. Aeroflow does not employ physicians but hires physicians as independent contractors to perform and read testing. Physicians then may prescribe the use of medical products, which Aeroflow sells.

{12} On January 1, 2010, Dr. Stern opened ARSM with offices in Huntersville and Hendersonville, North Carolina. Dr. Stern is the only licensed physician and sole member of ARSM. Dr. Stern is board certified in internal medicine, pediatrics, pulmonology, critical care medicine, and sleep medicine. At ARSM, Dr. Stern provides adult pulmonary consultations and adult and pediatric sleep consultations. (Aff. of Dr. Thomas P. Stern ("Dr. Stern Aff.") ¶¶ 2–4.) Dr. Stern or ARSM occasionally sells home medical equipment, but such sales are incidental to the medical practice.

{13} On or about June 22, 2009, Aeroflow and Arias entered into the Agreement. (First Am. V. Compl. ¶ 13.) As an Outside Marketing Representative, Arias' duties were to meet with physicians, hospitals, and other medical providers to educate them about Aeroflow's products.

{14} The Agreement specifically defines Aeroflow's "Business" as "providing and selling home medical equipment[.]" (First Am. V. Compl., Ex. A ("Agreement").)

{15} The Agreement contains four restrictive provisions: non-competition, non-disclosure, non-solicitation, and employee interference. Some, but not all, depend on whether Arias was terminated for cause. Some, but not all, apply only to the defined term "Business."

{16} The non-competition provision restricts Arias from competing with Aeroflow "by entering into or attempting to enter into any business substantially similar to [Aeroflow's] Business for any reason whatsoever, directly or indirectly, . . ." within sixty (60) miles of the four Aeroflow facilities listed in the Agreement or any future facility established during Arias' employment with Aeroflow, for twelve (12) months following his employment with Aeroflow. (*Id.* at ¶ 14(b)(i).) The

Agreement provides that the non-competition provision does not apply if Aeroflow terminates Arias' employment without cause.

{17} The non-disclosure provision restricts Arias from disclosing any of Aeroflow's Confidential Information that Arias became aware of by reason of his employment with Aeroflow for his benefit or the benefit of any other person or entity.[2]  (*Id.* at ¶ 14(b)(ii).)  The provision further restricts Arias from retaining Confidential Information in any written or electronic form following termination.  (*Id.*)  This provision applies whether or not Arias was terminated for cause.

{18} The non-solicitation provision restricts Arias from soliciting Business from any customer, client, patient, referral source, or contractor of Aeroflow who did Business with Aeroflow during the twelve (12) months preceding Arias' termination, on his own behalf or as a agent or independent contractor of another person or entity, for twelve (12) months following his employment with Aeroflow.  (*Id.* at ¶ 14(b)(iii).)  The Agreement provides that the non-solicitation provision does not apply if Aeroflow terminates Arias' employment without cause.

{19} The employee interference provision restricts Arias from hiring, attempting to hire, inducing to terminate or otherwise work for an Aeroflow competitor, or attempting to induce to terminate or otherwise work for an Aeroflow competitor an Aeroflow employee, employed within the three (3) months preceding Arias' termination, for twelve (12) months following his employment with Aeroflow.  (*Id.* at ¶ 14(b)(iv).)  This provision applies whether or not Arias was terminated for cause.

{20} The Agreement allows Aeroflow to terminate Arias "for cause" without the necessity of prior notice.  However, notice is required in connection with the termination.

---

[2] In Paragraph 14(a) of the Agreement, Confidential Information is defined to mean "any and all data and information of any type relating to the business of Employer which has [sic] been disclosed or otherwise become known to Employee as a result of his or her employment with Employer and which is not generally known to Employer's competitors or to the public and which has been treated by Employer as confidential, including, but not limited to: (i) customer lists, client lists and or patient lists, (ii) suppliers lists, (iii) referral bases and referral source lists . . . ." (Agreement.)

{21} The Agreement specifically defines "for cause" as "Employee's gross, willful and continuous failure to comply with the terms of this Agreement; Employee's noncompliance with the rules and regulation of the Employer; Employee's failure to perform his or her duties competently; any material violation of Employee of his or her obligations under this Agreement; . . . ." (*Id.* at ¶ 5(c).)

{22} The Agreement does not detail any specific job description, duties, or quotas.

{23} The Agreement states that any notice required by the Agreement "shall be given in writing and delivered as follows:  (a) by personal delivery, with a witness, to Employee or Employer; or (b) by certified or registered mail, return receipt requested, addressed to . . . in the case of Employee, to his or her last known address." (*Id.* at ¶ 11.)

{24} Aeroflow maintains facilities at Asheville, Gastonia, Hendersonville, Hickory, Waynesville, and Wilkesboro, North Carolina, and Johnson City, Tennessee.  During Arias' employment with Aeroflow, his sales territory included Claremont, Hickory, Lenoir, Lincoln, Morganton, Newton, Gastonia, Huntersville, Kings Mountain, Mooresville, Newton, and Statesville, North Carolina and the surrounding areas.

{25} The parties dispute whether Arias had sufficient job duties connected with each of Aeroflow's locations, such that extending the restrictive covenants to the geographic territory of each location as provided by the Agreement would be unreasonable.  Aeroflow suggests that the Court may elect to enforce only those territories it deems reasonable, as the covenants are written in a way that unreasonable geographies may be "blue penciled."  The Court need not resolve that dispute or exercise that doctrine with regard to the non-competition provision because it reaches its determination as to the unenforceability of that covenant on other grounds.   If geographic scope were the only limiting factor for the non-solicitation covenant, the Court would conclude that there is no real issue of overbreadth, because the covenant only relates to referral sources with whom Arias dealt and is then self-restricting in geographic scope.

{26} In April 2010, while employed by Aeroflow, Arias began soliciting business from Dr. Stern and his medical practice, ARSM.  Dr. Stern referred approximately ninety-six (96) patients to Aeroflow between April and November 2010.  Also during this period, Dr. Stern introduced Arias to many physicians in an effort to help Arias and Aeroflow increase referrals.  (Dr. Stern Aff. ¶ 8.)

{27} Dr. Stern later reduced the number of patients he referred to Aeroflow.  The parties assign different reasons for this reduction.  Aeroflow contends that Dr. Stern lost privileges with a former employer and elected to sell CPAP machines on his own account to supplement his revenues.  Arias and Dr. Stern contend the reduction was because of customer service concerns and Aeroflow's loss of Medicare approval.  Approximately thirty percent (30%) of Dr. Stern's patients are insured through Medicare.  (*Id.* ¶ 10.)

{28} When Dr. Stern prescribes CPAP for a patient, he usually inquires if the patient has a preference about where to purchase the machine.  If the patient does not have a preference, he may recommend a durable medical equipment company.  Occasionally Dr. Stern will sell CPAP machines to his non-Medicare/Medicaid patients with whom he has an existing physician-patient relationship.  Such sales account for approximately twelve percent (12%) of ARSM's revenue.  (*Id.* at ¶ 6.)

{29} On January 25, 2011, Aeroflow gave Arias his first written warning for falling below eighty percent (80%) of his sales goals five times in the previous six months, which he signed.  A week later, on February 2, 2011, Aeroflow gave Arias his second written warning for falling below eighty percent (80%) of his sales goals six times in the previous seven months, which he signed.  When receiving both of these warnings, Arias requested that Aeroflow lower his sales goals to reflect the reduction in referrals from Dr. Stern's practice and Aeroflow's loss of Medicare approval.  Mr. Hite testified that Aeroflow made such adjustments, a fact which Arias appears to dispute.  Aeroflow alleges that on March 3, 2011, Arias' supervisor gave Arias the third and final written warning, which Aeroflow equates to notice of termination "for cause," and that Arias refused to sign it.  Aeroflow further alleges it sent notification of termination "for cause" to Arias via certified mail on March 3,

2011, although the face of the letter reflecting the termination does not indicate that it was sent by this delivery method, and Aeroflow did not introduce a delivery receipt.[3]  Arias disputes this assertion and alleges that on March 3, 2011, his supervisor called and notified him that he was terminated without explanation. Arias denies he was terminated "for cause."  Arias further states that he did not receive written communication from Aeroflow explaining the reason for his termination prior to the commencement of this litigation.  (Arias Aff. ¶ 11.)

{30} Arias notified Dr. Stern that Aeroflow terminated his employment.  In March 2011, Dr. Stern hired Arias as an employee of ARSM and assigned him the responsibility to increase patient referrals to ARSM by marketing Dr. Stern and ARSM's pulmonary and/or sleep disorder services to primary care physicians. (Stern Aff. ¶ 11.)

{31} Arias admits that on ARSM's behalf he called on physicians with whom he had relationships with while employed by Aeroflow.  However, Arias contends that he has not solicited or sold any home medical equipment, including CPAP machines, to any such physician.  (Arias Aff. ¶ 13.)  However, as Mr. Hite testified, Aeroflow contends that Dr. Stern has sold such equipment as a result of referrals procured by Arias, therefore Arias should be considered to have solicited such sales.

### III.  ANALYSIS

A. <u>Standard for Preliminary Injunction</u>

{32} A preliminary injunction is an extraordinary measure that "should not be lightly granted." *Travenol Lab., Inc. v. Turner*, 30 N.C. App. 686, 692, 228 S.E.2d 478, 483 (1976).   A preliminary injunction is "issued only (1) if the plaintiff is able to show a *likelihood* of success on the merits of [its] case; and (2) if a plaintiff is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of a plaintiff's rights during the course of litigation."  *A.E.P. Indus., Inc., v. McClure*, 308 N.C. 393, 401, 302

---

[3] Aeroflow introduced the March 3 letter at the June 8 hearing.  Mr. Hite testified that the letter had been sent by registered or certified mail. (Pl.'s Ex. D at Hr'g June 8, 2011.)

S.E.2d 754, 759–60 (1983) (emphasis in original).  The burden is on the moving party to establish its right to a preliminary injunction.  *Id.*

{33} Aeroflow seeks a preliminary injunction to enjoin Arias from violating each of the four restrictive provisions contained in the Agreement.[4]  To grant an injunction for each of the four provisions, Aeroflow has the burden to show both that it is likely to succeed on the merits of the claim and that it will suffer irreparable harm if the injunction is not granted.  As an initial matter, each of these four covenants is a matter of contract, such that Aeroflow must demonstrate a probability of success on the two essential elements of any breach of contract claim, which are (1) existence of a valid contract and (2) breach of terms of that contract.  *Poor v. Hill*, 138 N.C. App. 19, 25, 530 S.E.2d 838, 843 (2000) (internal citations omitted).  There are additional and more specific requirements for the different covenants.

B.  Non-Competition Provision

{34} In order to demonstrate a likelihood of success on the merits, an employer seeking a preliminary injunction to enforce a non-competition clause in an employment contract must show that the agreement itself is valid and enforceable.  *See A.E.P. Indus.*, 308 N.C. at 402, 302 S.E.2d at 760.  In general, while North Carolina will enforce restrictive employment covenants, they are disfavored.  *See, e.g., Farr Assocs. v. Baskin*, 138 N.C. App. 276, 279, 530 S.E.2d 878, 881 (2000) ("Covenants not to compete between an employer and employee are not viewed favorably in modern law.") (internal quotation and citation omitted).

{35} Under North Carolina law, for a non-competition agreement to be valid and enforceable it must be: "(1) in writing; (2) part of an employment contract; (3) based on valuable consideration; (4) reasonable as to time and territory; and (5) designed to protect a legitimate business interest."  *Med. Staffing Network, Inc. v.*

_____

[4] This Motion requires the Court to interpret the Agreement.  When interpreting a contract, if the meaning is clear and only one interpretation is reasonable, the courts must enforce the contract as written, but if a provision is uncertain or open to several reasonable interpretations, doubts will be resolved against the drafter.  *See Woods v. Nat'l Ins. Co.*, 295 N.C. 500, 246 S.E.2d 773 (1978). "Covenants not to compete restrain trade and are scrutinized strictly."  *Washburn v. Yadkin Valley Bank and Trust Co.*, 190 N.C. App. 315, 323, 660 S.E.2d 577, 583 (2008) (internal citations omitted).

*Ridgway*, 194 N.C. App. 649, 655, 670 S.E.2d 321, 327 (2009). The parties do not dispute that the non-competition provision is in writing, part of the employment contract, and based on valuable consideration. Arias contends that the covenant is unenforceable because it is not reasonable as to time and territory and does not protect a legitimate business interest.

{36} The covenant not to compete becomes unenforceable if it is not designed to protect a legitimate business interest of the employer. *Young v. Mastrom, Inc.*, 99 N.C. App. 120, 123, 392 S.E.2d 446, 448 (1990) (citation and quotations omitted). The covenant "must be no wider in scope than is necessary to protect the business of the employer." *Hartman v. Odell & Assocs., Inc.*, 117 N.C. App. 307, 316, 450 S.E.2d 912, 919 (1994). If the covenant not to compete is "too broad to be a reasonable protection to the employer's business it will not be enforced." *Whittaker Gen. Med. Corp. v. Daniel*, 324 N.C. 523, 528, 379 S.E.2d 824, 828 (1989) (citations omitted).

{37} Here, the Agreement would restrict Arias from competing with Aeroflow "by entering into or attempting to enter into any business substantially similar to [Aeroflow's] Business for *any reason* whatsoever, directly or indirectly. . . ," (emphasis added) for twelve (12) months following his employment with Aeroflow. The plain language of the non-competition provision, drafted by Aeroflow, would prevent Arias working for a competitor in a position wholly outside the scope of his employment with Aeroflow. The Court finds this language overly broad to protect a legitimate business interest of Aeroflow. *See Digital Recorders, Inc. v. McFarland*, 2007 NCBC 23 (N.C. Super. Ct. 2007) (finding the restriction too broad when it prevents the former employee from working for a competitor in a position wholly unrelated to the work performed for the plaintiff). Therefore, the covenant against competition is unenforceable as a matter of law.[5]

{38} The Court need not then separately consider whether the geographic scope of the covenant is unreasonable and whether Aeroflow has to date suffered any irreparable harm from a breach of that covenant. Neither must it for purposes

---

[5] This conclusion does not depend on further factual inquiry and is a final resolution of this issue.

of this particular covenant determine whether Aeroflow has presented evidence supporting a probable finding that Arias' employment was terminated for cause or whether ARSM and Aeroflow are engaged in a similar Business.

{39} Therefore, Aeroflow cannot demonstrate a likelihood of success on the merits of its claim for violation on the covenant against competition, and the Court DENIES Aeroflow's Motion as it pertains to the non-competition provision of the Agreement.

C. Non-Disclosure of Confidential Information Provision

{40} Aeroflow claims a breach of contract for the non-disclosure provision of the Agreement against Arias and claims violations of the Trade Secret Protections Act. The Court's first inquiry is whether Aeroflow has demonstrated a likelihood of success on the merits of its claims against Arias. The likelihood of success results from the movant's prima facie showing of the requisite elements of the claims asserted. *Elec. South, Inc. v. Lewis*, 96 N.C. App. 160, 165, 385 S.E.2d 352, 355 (1989). An injunction will not be issued simply to appease a groundless apprehension on the part of a plaintiff. *Kadis v. Britt*, 224 N.C. 154, 161, 29 S.E.2d 543, 547 (1944).

{41} The parties do not dispute the validity of the non-disclosure provision of the Agreement or Aeroflow's right to protect its trade secrets. However, Arias and ARSM contend that Aeroflow has not introduced actual evidence that the contractual provision has been breached or that they have misappropriated any trade secrets. The Court concludes that there has not been sufficient evidence introduced to conclude that the Arias misused the Confidential Information or that the Confidential Information qualifies as a trade secret and, if so, whether any such trade secret has actually been misappropriated.

{42} Aeroflow includes the broad assertion in its Verified Complaint that Arias used and disclosed its Confidential Information in a manner that harms Aeroflow, that the identity of its referral sources are confidential, and that Arias violated the Agreement by contacting Aeroflow's referral sources on behalf of Dr.

Stern and ARSM.[6]   Mr. Hite repeated these broad assertions in his hearing testimony.  However, Aeroflow has not provided any affidavits from the "referral source" attesting to these allegations, nor has Aeroflow provided any specific use, specific disclosure, or specific harm suffered.  Aeroflow fails to present any specific evidence to bolster its suspicion that Arias has or will violate the non-disclosure provision.  Therefore, Aeroflow fails at this stage of litigation to demonstrate that it likely will succeed on the merits of the breach of contract claim as it pertains to the non-disclosure provision.

{43} As to the trade secrets claim, Aeroflow has likewise failed to demonstrate proof justifying a preliminary injunction.  "To plead misappropriation of trade secrets, a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur[.]" *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 510–11, 606 S.E.2d 359, 364 (2004).  Here, Aeroflow claims broadly that its trade secrets consist of the company's customers, referral sources, products, services, and pricing structure.[7]   However, allegations that these items may be found as trade secrets does not constitute adequate proof that they are, in fact, trade secrets.  Defendants assert that Aeroflow's customers and referral sources are the medical service providers found in the phone book, and its products and services are available to the public on its website.  Aeroflow counters that Arias is also aware of the peculiar habits and wants of the medical providers and is further aware of Aeroflow's pricing structure.  However, Aeroflow offered no testimony that Arias actually used any such

---

[6] Aeroflow's vague reference in the First Amended Complaint states: "In March 2011, after his employment with Aeroflow had ended, Arias contacted an Aeroflow referral source that Arias had called on while employed by Aeroflow and mislead the referral source into thinking that Mr. Arias was still employed by Aeroflow when the referral source placed an order, at which point Aeroflow informed the referral source that Arias no longer worked for Aeroflow despite his misrepresentation to the contrary." (First. Am. V. Compl. ¶ 42.)

[7] In supporting this claim, Aeroflow relies on *Drouillard v. Keister Williams Newspaper Servs.*, 108 N.C. App. 169, 423 S.E.2d 324 (1992) (finding customer pricing to be protectable as a trade secret) and *Wilmington Star-News v. Med. Ctr.*, 125 N.C. App. 174, 480 S.E.2d 53 (1997) (holding a jury *could* conclude that price lists constituted trade secrets) (emphasis added).  (Mem. in Supp. of Pl.'s Mot. for a Prelim. Inj. 8–9.)

information, and, thus, there is an inadequate showing at this juncture that Aeroflow will probably succeed in proving misappropriation.

{44} In order to establish a prima facie case for violation of the Trade Secret Protections Act, the plaintiff must offer substantial evidence that the defendant "(1) knows or should have known of the trade secret, and (2) has had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed or used it without the express or implied consent of the owner." N.C. Gen. Stat. § 66-155.

{45} While there is no direct evidence presented that Arias was aware of Aeroflow's pricing structure, such knowledge may be reasonably inferred from Arias' position as an Outside Marketing Representative. However, Aeroflow must also show that Arias disclosed or used this knowledge without its express or implied consent. Here, Aeroflow has failed to date to present any evidence to convince the Court that Arias has both acquired and misused knowledge of trade secret information without Aeroflow's consent. Based on the evidence presented, Aeroflow has not shown an adequate prima facie case to justify the issuance of an injunction pursuant to the Trade Secrets Protection Act.

{46} Therefore, the Court DENIES Aeroflow's Motion as it pertains to the non-disclosure of confidential information provision of the Agreement.

D. Non-Solicitation Provision

{47} For a non-solicitation agreement to be held valid it must meet the same requirements as are applied to the covenant not to compete: (1) in writing; (2) part of an employment contract; (3) based on valuable consideration; (4) reasonable as to time and territory; and (5) designed to protect a legitimate business interest.[8] *Edgewater Services, Inc. v. Epic Logistics, Inc.*, 2009 NCBC 20 ¶ 23 (N.C. Super. Ct. 2009). There is no dispute as to the first three elements because the contract was written, part of the employment agreement, and based on valuable consideration. The issue of the scope and legitimacy of business purpose on which the Court found

---

[8] While the elements are the same for the two covenants, non-solicitation agreements are more easily enforced. *See generally Asheboro Paper and Packaging, Inc. v. Dickinson*, 599 F. Supp. 2d 664 (M.D.N.C. 2009).

that the non-competition provision should not be enforced does not control enforcement of the solicitation provision. The Court finds the non-solicitation restrictions reasonable for time and territory and designed to protect a legitimate business interest. Therefore, the court finds the non-solicitation provision valid and enforceable.[9]

{48} The question then arises whether Aeroflow produced sufficient evidence that the covenant has been actually breached. To secure a preliminary injunction, Aeroflow must produce adequate evidence to demonstrate a likelihood that it will prove that Arias has solicited "Business" in violation of the Agreement, that he was terminated "for cause", and that notice was provided as required by the Agreement.

{49} First, the Court considers whether Arias' contact with one of Aeroflow's referral sources constitutes solicitation of "Business" as defined by the Agreement. The Agreement defines Aeroflow's "Business" as providing and selling home medical equipment. Both affidavits from Arias and Dr. Stern state that Arias' job was to market Dr. Stern and ARSM to primary care physicians and to seek referrals to Dr. Stern's medical practice for medical services. They contend that Dr. Stern has only incidental sales of home equipment, so that Dr. Stern cannot be said to conduct a substantially similar "Business," and Arias cannot be said to have solicited such "Business" by seeking a referral to Dr. Stern but not selling or attempting to sell equipment. Arias and Dr. Stern further argue that the businesses are dissimilar because Aeroflow does not and cannot provide physician services. The Court concludes that the issue must be determined by reference to the contractual definition of Business, even though the broader business of Aeroflow and ARSM may overlap in other ways. The Court does not conclude that the businesses are dissimilar simply because Aeroflow outsources the physician review of diagnostic testing rather than employing physicians directly. The issue is a very close one, but the Court concludes that Arias' solicitation of a customer for diagnostic testing

---

[9] As noted earlier, because the non-solicitation provision is limited to referral sources with whom Arias dealt while employed by Aeroflow, the Court does not perceive that the covenant is too broad in its geographic scope.

without also selling or attempting to sell equipment is not the solicitation of "Business;" however, it would become so if Arias attempts or offers to sell equipment which is also sold by Aeroflow to a referral source with whom he had a relationship while employed by Aeroflow.

{50} Second, the Court considers whether the evidence to date demonstrates that Aeroflow terminated Arias' employment "for cause" as defined by the Agreement. If he was not, the non-solicitation provision does not apply. The Agreement defines "for cause" as "Employee's gross, willful and continuous failure to comply with the terms of this Agreement; Employee's noncompliance with the rules and regulation of the Employer; Employee's failure to perform his or her duties competently; [or] any material violation of Employee of his or her obligations under this Agreement; . . . ." (Agreement ¶ 5(c).)

{51} Aeroflow argues the termination was "for cause" because Arias failed to meet his sales goals, thereby failing to comply with the rules and regulations of the Employer. The Court concludes that this argument fails for three reasons. First, the Agreement makes no direct reference to any requirement to meet sales goals. Second, Aeroflow has offered no proof of any "rules or regulations." Third, the warning form used by Aeroflow has a selection of four boxes for indicating the reason for the warning, which include: "violation of work rules;" "violation of company policy;" "violation of safety rules;" and "Other." (Pl.'s Ex. C at Hr'g June 8, 2011.) On all three warnings given to Arias prior to his termination, Aeroflow checked the box next to "violation of company policy" and not the "violation of work rules."

{52} Aeroflow further argues that Arias' failure to meet his sales goals falls within the Agreement's "for cause" definition of "Employee's failure to perform his or her duties competently." Again, there is no documentation presently in the record that equates a failure to meet sales goals to incompetence. Arias argues that any reduced sales performance may be attributable to Dr. Stern's reduction in referrals and Aeroflow's loss of Medicare approval, rather than his incompetence.

At this juncture, the evidence does not compel a conclusion that Aeroflow's position will be sustained.

{53} In sum, the Court believes that these issues preclude a finding of a probability of Aeroflow's success that Aeroflow will prove that Arias was terminated for cause as defined by the Agreement.

{54} The Court has also considered whether Aeroflow has produced evidence sufficient to meet its burden to show a probability that it will prove that Arias was provided the notice required by the Agreement. Under paragraph 5(a) of the Agreement, termination requires ten (10) working days prior written notice by the terminating party. Paragraph 5(c) provides an exception and authorizes the Employer to terminate "for cause" without "prior notice." The issue here is not whether notice was timely, but rather whether notice of termination was provided in conformity with the Agreement's requirement for the nature and form of that notice.[10]

{55} Paragraph 11 of the Agreement specifies notice requirements. It provides that all required communication of the Agreement "shall be given in writing and delivered as follows: (a) by personal delivery, with a witness, to [Arias] from [Aeroflow]; or (b) by certified or registered mail, return receipt requested . . . ." Aeroflow claims it provided such notice. First, Aeroflow claims it sent Arias notification via certified mail. Arias disputes this claim. The termination letter itself gives no indication it was sent via certified mail, nor did Aeroflow submit a receipt supporting this claim. The evidence presented at this time does not allow a finding that the letter was, in fact, sent by registered or certified mail. Second, Aeroflow claims notice was provided in person to Arias during the third disciplinary

---

[10] Paragraph 5(c)'s elimination of the requirement for prior notice could be reasonably interpreted as either eliminating the requirement for notice altogether or that the ten days prior notice is not required. Again, the Court must interpret any ambiguity against the drafter of the Agreement. Here, Aeroflow's choice of terminology of "prior notice" has two reasonable interpretations, and the Court finds that the exception for termination for cause excuses only the requirement for ten (10) days prior notice, but it does not excuse notice altogether.

warning.[11]  Mr. Hite was firm in his testimony that Arias was notified in person, but Arias testified by affidavit that he was not notified.  Even if this factual dispute were resolved in Aeroflow's favor, there is no evidence in the record that such personal delivery by Arias' supervisor was in the presence of a witness as required by the Agreement.

{56} In sum, there are limitations in the evidence to date that preclude a finding that Aeroflow has demonstrated a probability of success that it will prevail on proof of a violation of the non-solicitation clause, even though the covenant is itself valid.[12]  The Court then DENIES Aeroflow's Motion as it pertains to the non-solicitation provision of the Agreement.

E.  Employee Interference Provision

{57} Aeroflow claims both a breach by Arias of the covenant against employee interference and tortious interference by ARSM.  To prove a likelihood of success on this claim, Aeroflow must make a prima facie showing of the requisite elements of the claims asserted.  *Elec. South, Inc.*, 96 N.C. App. at 165, 385 S.E.2d at 355.  The claim of tortious interference with existing business relations provides redress when the defendant induces a third party not to perform an existing contract with the plaintiff.  North Carolina law specifies five elements required to prevail on this claim.  *Beck v. City of Durham*, 154 N.C. App. 221, 232, 573 S.E.2d 183, 191 (2002).  First, a valid contract must exist between the plaintiff and a third party that provides the plaintiff with contractual rights.  Second, the defendant must have knowledge that the contract exists.  Third, the defendant must intentionally induce the third party not to perform the contracts.  Fourth, the defendant must induce the nonperformance of the contract without justification.  Fifth, the third party's failure to perform the contract must result in actual damage to the plaintiff.  *Id.*

---

[11] The third disciplinary warning states in part: "This is the 3rd warning.  Per company policy the result is termination."  (Pl.'s Ex. C at Hr'g June 8, 2011.)  There is no express statement on this exhibit indicating the termination is "for cause" or in violation of company rules.  It also has no indication that a witness was present when the warning and document was provided to Arias.

[12] Had the non-competition agreement been otherwise valid, Aeroflow would have been burdened by these same failures of evidence.

{58} The parties do not contest that the Agreement including the employee interference provision is valid. However, there is a factual dispute as to whether Arias breached it. Aeroflow contends that on March 16, 2011 Arias aggressively, but unsuccessfully, solicited Amanda L. Stoy ("Stoy"), an Aeroflow Respiratory Therapist, to leave her employment with Aeroflow. Stoy submitted an affidavit regarding this contact. Aeroflow acknowledges that Stoy did not leave her employment. In Arias' affidavit, he contends that his contact with Stoy was not to invite Stoy to leave her employment, rather it was to provide Stoy an opportunity that would not affect her employment with Aeroflow. Beyond this disputed issue of what actually occurred between Stoy and Arias, there is no further evidence demonstrating a substantial likelihood that Arias will make any future effort to encourage any Aeroflow employee to leave Aeroflow. There is no proof of actual damage to Aeroflow. As a result, Aeroflow has not at this juncture demonstrated that it has or will suffer irreparable harm by Arias' alleged breach of the employment interference covenant sufficient to justify injunctive relief.[13] Therefore, the Court DENIES Aeroflow's Motion as it pertains to the employee interference provision of the Agreement.

## IV. CONCLUSION

{59} The Court then concludes:

1. The non-competition covenant of paragraph 14(b)(i) of the Agreement is overly broad and is invalid and unenforceable;

2. There is insufficient evidence in the record to show that there is risk of misappropriation or misuse of "Confidential Information" by Arias in violation of the non-disclosure provisions of paragraph 14(b)(ii) of the Agreement;

---

[13] This finding does not preclude the Court from reconsidering the issue and granting an injunction should Arias breach the employee interference provision in a manner that may cause or causes Aeroflow irreparable harm prior to the end of this litigation.

3. There is insufficient evidence in the record to show that Aeroflow's Confidential Information is a trade secret or that any trade secret has been misappropriated;

4. There is insufficient evidence in the record to show that Arias breached the non-solicitation covenant of paragraph 14(b)(iii) of the Agreement, because there are questions of proof whether Arias solicited Business for ARSM that was substantially similar to Aeroflow's Business, whether Aeroflow terminated Arias "for cause," and whether Aeroflow provided notice as required by the Agreement; and

5. There is insufficient evidence in the record to show that Aeroflow has suffered or is likely to suffer actual harm because of Arias' alleged violation of the employee interference provisions of paragraph 14(b)(iv) of the Agreement.

{60} The Court, therefore, DENIES Plaintiff's Motion for Preliminary Injunction. The Temporary Restraining Order has expired and is no longer in effect. The Plaintiff shall be relieved of its bond. The Court finds no basis upon which to award damages for wrongful issuance of the TRO.

This the 5th day of July 2011.